**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**JESSICA A. LENNOX,** *individually and as mother*
*and natural guardian of* **A.L.,** *an infant,*

                                        **Plaintiffs,**

          **vs.**                                              **3:17-CV-786**
                                                               **(MAD/DEP)**

**BRANDON CLARKE,** *individually and as a Police*
*Officer of the City of Norwich, New York***, THOMAS**
**MILLER,** *individually and as a Police Officer of the*
*City of Norwich, New York***, RODNEY V. MARSH,**
*individually and as Chief Police of the City of*
*Norwich, New York***, and the CITY OF NORWICH,**
**NEW YORK,**

                                        **Defendants.**
_____

APPEARANCES:

**APPEARANCES:**                              **OF COUNSEL:**

**STEPHEN L. LOCKWOOD, P.C.**          **STEPHEN L. LOCKWOOD, ESQ.**
285 Genesee Street
Utica, New York 13501
Attorney for Plaintiffs

**JOHNSON & LAWS, LLC**                **APRIL J. LAWS, ESQ.**
648 Plank Road, Suite 204              **GREGG T. JOHNSON, ESQ.**
Clifton Park, New York 12020           **COREY A. RUGGIERO, ESQ.**
Attorneys for Defendants


**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

          Plaintiffs Jessica A. Lennox and A.L., Lennox's infant son, initiated this action on July 18,

2017, alleging police misconduct during the arrest of Lennox on July 22, 2016.  *See* Dkt. No. 1 at

¶ 1.  Presently before the Court is Defendants' Motion for Summary Judgment.  For the following

reasons, that motion is granted in part and denied in part.

## II. BACKGROUND

**A.     Facts**

### *1. Cobbler Square Park*

On July 22, 2016, the Norwich Police Department ("NPD") responded to an incident at Cobbler Square Park in Norwich, New York, that involved Lennox and B.C., a fifteen year old girl who Lennox believed had been "hanging out" with her ex-boyfriend, Dominic Lepera.[1]  *See* Dkt. No. 37 at ¶¶ 1, 2; Dkt. No. 27-16 at 10.  The incident erupted when Lennox saw Lepera in a crowd of teenagers in the park.  *See* Dkt. No. 27-14 at ¶¶ 2-4; Dkt. No. 32 at ¶ 4; Dkt. No. 27-18 at 100-101.  According to witnesses, Lennox approached the crowd, yelled at B.C., struck B.C. in the face, and spat on another minor.  *See* Dkt. No. 27-16 at 10-12, 37-39, 48-49.  Lennox claims that she "wasn't threatening," although she admits that she "might have cursed" at the crowd.  *See* Dkt. No. 32 at ¶ 40; Dkt. No. 27-18 at 101.  B.C.'s brother called the police for assistance, which according to Lennox, was done at her request.  *See* Dkt. No. 32 at ¶ 7.  Lepera fled the scene immediately before the police arrived.  *See* Dkt. No. 27-16 at 134.

Officer Miller arrived on the scene first, followed by Officer Clarke.  *See* Dkt. No. 37 at ¶¶ 34, 35.  Lennox claims that Officer Clarke "came at her aggressively" and when she asked him to arrest Lepera, he responded, "[d]on't fucking tell me how to do my job."  *See* Dkt. No. 32 at ¶ 110.  The parties agree that Lennox told Officer Clarke, "okay, so you want to stick up for a heroin addict, then you should go do heroin with him."  *See* Dkt. No. 37 at ¶¶ 38, 39.  Officer Clarke placed Lennox under arrest, and the parties agree that Lennox was handcuffed while she was standing.  *Id.* at ¶ 41.  From there, the parties' accounts of the events diverge.

---

[1] Lepera was a heroin user who had a warrant out for his arrest.  *See* Dkt. No. 32 at ¶ 110.

According to Lennox, Officer Clarke, "handcuffed her and placed her on the ground putting both knees on her back" and "threw [her] . . . [o]nto the grass." *See* Dkt. No. 32 at ¶¶ 42, 110; Dkt. No. 27-18 at 105-06. As he handcuffed her, Lennox's son A.L. "fell out of [her] arms and hit the ground. But he was okay." *See* Dkt. No. 27-18 at 104. Lennox claims that although she tried to "pull away" from Officer Clarke after she was handcuffed, he was "just way too strong to even attempt anything." *Id.* at 106; *see also* Dkt. No. 27-16 at 140 (stating that "[h]e had me when he put his arms - first of all, I'm scared of him . . . [a]nd second of all, he's huge. When he grabbed me, there was no movement, I couldn't move my arms and I had bruises from that"). Nevertheless, Officer Clarke "put both knees on her back causing her pain and to urinate herself." *See* Dkt. No. 32 at ¶ 110; *see also id.* at ¶ 44 (claiming that Officer Clarke "placed so much pressure on her back and body it caused her to urinate all over herself"); *but see* Dkt. No. 27-18 at 112-113 (Lennox testifying that she asked witnesses what Officer Clarke did to her back, because she "wasn't completely sure"). Lennox claims that she was "screaming for help" during the arrest, and that Officer Miller "looked me right in the face while I was on the ground when Officer Clarke bashed my head." *See* Dkt. No. 27-16 at 140, 153.

In Defendants' version of events, Officer Clarke had to bring Lennox onto the ground because Lennox attempted to flee from his custody. *See* Dkt. No. 27-14 at ¶¶ 42, 43. Defendants also point out that when they arrived, Lennox was yelling at the group of teenagers, had struck B.C. in the face, spat on one of the teenagers, and used profanities to address the minors in front of the police officers. *Id.* at ¶¶ 6-11, 39-40. Defendants claim that they only used "soft hand techniques" on Lennox, and that she was brought to the ground on grass. *Id.* at ¶¶ 16, 42. The parties agree that Officer Clarke did not use OC spray, a baton, or a taser during Lennox's arrest, and that the whole ordeal lasted about three to four minutes. *See* Dkt. No. 37 at ¶¶ 17-19, 45.

During the arrest, Lennox's earrings were jammed into her cartilage, causing her ears to bleed and swell. *See* Dkt. No. 32 at ¶ 110; Dkt. No. 27-18 at 121. Additionally, Lennox claims that she suffered bruises on her arms and a scrape on her right shoulder. *See* Dkt. No. 37 at ¶ 86. Lennox admits that A.L. was not physically injured during her arrest. *See* Dkt. No. 27-11 at 104.

### 2. Police Station

Lennox was taken to the police station and held in a holding area while she waited to be processed. *See* Dkt. No. 27-8, Booking Video. A video recording from the holding area shows that Lennox was hysterical, refused to remain seated where officers told her to sit, and ignored officers' requests that she calm down. *Id.* at 0:05-1:40 (showing Lennox refusing to sit in chair as instructed and an officer securing her handcuffs to a bull ring in the wall); *id.* at 5:00-5:27 (showing an officer asking Lennox to calm down because her son could hear her from the other room); *id.* at 10:54-12:00 (showing Lennox yelling and screaming while sitting on the floor). Lennox repeatedly complained that her handcuffs were too tight until eventually an officer came to adjust them.[2] *Id.* at 1:16-1:22; 1:38-1:50; 3:40-4:34.

Additionally, the video shows Lennox yelling about how a police officer attacked her. *Id.* at 4:12-4:23 (asking "he just crushed me, why did he do that? What did I do?"); *id.* at 4:40-50 (yelling "he crushed me and made me pee myself" and that "he made me bleed . . . what did I do?"); *id.* at 4:57-5:02 (claiming "he attacked me"); *id.* at 15:52-16:23 (yelling "look what he did to me. He pounded me until I pissed myself and I didn't do anything. He grabbed me and attacked me . . . look at me. I'm bleeding, he pounded my head in. He made me piss myself. And

___

[2] The video shows Lennox pulling on the handcuffs while complaining that they are hurting her. *Id.* at 3:40-4:34; *see also* Dkt. No. 27-16 at 157-59 (testifying during her criminal trial that she was yanking on the handcuffs and tried to take the handcuffs off). Nevertheless, in Plaintiffs' Rule 7.1 Statement of Material Facts, Lennox denies yanking on her handcuffs. *See* Dkt. No. 32 at ¶¶ 54, 55.

he sat on my body until I couldn't breathe and I didn't do anything").  Lennox also complains about her ears hurting, and appears to be holding her ears in pain.  *See id*. at 7:06-10:32 (touching her ears and yelling in pain); *id.* at 16:40-16:45 (yelling "I am in pain my earring is stuck in my ear and it hurts").

Finally, while at the police station, Lennox claimed that she was having a "mental breakdown" and that she needed her depression medication.  *See* Dkt. No. 37 at ¶¶ 51, 52.  At her criminal trial, Lennox testified that she said this because "I thought I was going to jail, so I said I wanted to go to a psychiatric hospital instead of jail."  *See* Dkt. No. 27-16 at 156-157.

### 3. *Binghamton General Hospital*

After Lennox was processed at the NPD station, the police brought her to Binghamton General Hospital.  *See* Dkt. No. 37 at ¶ 48.  Lennox received a CAT scan that revealed no abnormalities and confirmed she did not suffer a concussion.  *See id.* at ¶¶ 56-57; Dkt. No. 27-16 at 166-67 (testifying that she did not have a concussion but she received a CAT scan because blood was coming out of her ear).  The hospital treated Lennox's injuries with ibuprofen.  *See* Dkt. No. 37 at ¶ 49; *see also* Dkt. No. 27-16 at 154 (testifying that the hospital told her that she "could have developed cauliflower ears for as hard as [her] ears were hit and [her] earrings were stuck in [her] cartilage").  Additionally, Lennox underwent a psychiatric evaluation, but, according to Lennox, the hospital did not take it seriously because "[i]t was obvious I didn't need psychiatric help."  *See* Dkt. No. 27-18 at 126-127.  Lennox's arm bruises and shoulder scrape fully healed "in a couple of weeks" and her ears healed in "a little over two weeks."  *See* Dkt. No. 37 at ¶¶ 87-88.

### 4. *Personnel Complaint*

Lennox filed a personnel complaint with the NPD regarding her arrest, and met with Chief Marsh on July 28, 2016 to discuss her complaint. *Id.* at ¶¶ 67-69; Dkt. No. 27-21 at 1-3. On November 17, 2016, Lennox testified in a 50-h Examination. *See* N.Y. Gen. Mun. Law § 50-h (granting municipalities the right to examine any claimant who has filed a claim against them to determine "the extent of the injuries or damages").

### 5. *Criminal Case*

Lennox was charged with two counts of endangering the welfare of a child, harassment in the second degree, and disorderly conduct. *See* Dkt. No. 37 at ¶¶ 12-15. At trial, Lennox was found guilty of all four charges. *See id.* at ¶¶ 25-28.

## B. Procedural History

On July 18, 2017, Plaintiffs filed a Civil Complaint, alleging claims of excessive force, failure to intervene, negligence, and assault and battery. *See* Dkt. No. 1 at ¶¶ 36-48. Additionally, Plaintiffs bring a *Monell* claim for municipal liability against the City of Norwich. *Id.* at ¶¶ 50-53.

The parties completed discovery on August 31, 2018, and on November 13, 2018, Defendants moved for summary judgment. *See* Dkt. No. 27. Plaintiffs opposed that motion on December 17, 2018, and on January 4, 2019, Defendants filed their Reply. *See* Dkt. Nos. 33, 38. Defendants' Motion for Summary Judgment is presently before the Court.

## III. DISCUSSION

## A. Legal Standard

A court may grant a motion for summary judgment only if it determines that there are no genuine issues of material fact to be tried and that the movant is entitled to judgment as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations

omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

## B.   Plaintiff A.L.

Lennox commenced this action "individually and as mother and natural Guardian of A.L., an infant." *See* Dkt. No. 1; *see also* Fed. R. Civ. P. 17(c) (permitting an infant's guardian to sue on the infant's behalf). Still, the parties have proceeded as if Lennox is the sole Plaintiff in this case. The Complaint clearly alleges injuries on behalf of A.L., and it is unclear to this Court why the parties have not addressed A.L.'s claims. Regardless, because no triable issues of fact exist regarding A.L.'s claims, the Court grants summary judgment as to all of those claims.

Although Lennox was holding A.L. at the time she was arrested, A.L. was not physically injured by the events of July 22, 2016. *See* Dkt. No. 27-11 at 104. Still, the Complaint alleges that A.L. suffered the following injuries: "(1) [w]itnessing his mother being assaulted and battered, handcuffed and dragged away by Defendant Clarke; (2) [b]eing separated from his mother without knowing why she was assaulted, battered and dragged away; (3) [e]motional distress, mental anxiety and post-traumatic stress disorder." *See* Dkt. No. 1 at ¶ 35; *see also id.* at ¶ 44 (alleging that, as a result of Defendants' negligence, "Plaintiff A.L. was caused to suffer

emotional distress, mental anxiety and post-traumatic stress disorder").  Drawing all inferences in A.L.'s favor, the Court assumes that A.L. has alleged claims for intentional and negligent infliction of emotional distress, and finds that Defendants' conduct has failed to meet the extremely high threshold imposed by New York courts for either claim.

To maintain a claim for intentional infliction of emotional distress, a plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).  To bring a claim for negligent infliction of emotional distress, the plaintiff must allege that he suffered "an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (citations omitted).

Here, nothing in the record suggests that Defendants' conduct was "extreme or outrageous," nor was it intended to cause A.L. emotional distress, mental anxiety, or post-traumatic stress disorder.  Moreover, the record clearly shows that Defendants never endangered A.L.'s physically safety, and A.L. suffered no physical injuries during the arrest.  *See* Dkt. No. 27-11 at 104.  Accordingly, the Court finds that A.L.'s intentional and negligent infliction of emotional distress claims fail as a matter of law, and grants summary judgment in Defendants' favor as to A.L.'s claims.

**C.    Excessive Force**

*1. Legal Standard*

Claims that police officers used excessive force during an arrest are analyzed under the Fourth Amendment's reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

In order to establish a Fourth Amendment excessive force claim, an individual must demonstrate that the actions of the arresting police officer were objectively unreasonable in light of the surrounding circumstances. *See Owens v. Colburn*, 860 F. Supp. 966, 972 (N.D.N.Y. 1994) (citing *Graham*, 490 U.S. at 397). "The test of 'reasonableness' is not capable of precise definition or mechanical application; therefore, careful attention must be paid to the facts and circumstances of the case." *Id.* (citation omitted).

The court's application of the reasonableness standard is guided by (1) the nature and severity of the crime precipitating the arrest, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *See Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (citing *Graham*, 490 U.S. at 396). As to the third factor, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit. The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000) (emphasis in original).

Officers are often required to make sudden decisions during hostile or tense encounters that in hindsight may appear overly harsh. *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citation omitted). "[N]ot every push or shove, [ ... ] violates the Fourth Amendment, and several courts in this Circuit have required plaintiffs to allege more than a *de minimis* use of force to succeed on their excessive force claims." *LaFrance v. Bemben*, No. 10-CV-4583, 2013 WL 132702, *3-4 (E.D.N.Y. Jan. 10, 2013) (citation omitted). "Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief

numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, *5 (E.D.N.Y. Mar. 8, 2011) (internal citations omitted). While "the extent of the injury suffered . . . is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim." *Ortiz v. Pearson*, 88 F. Supp. 2d 151, 160 (S.D.N.Y. 2000). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) (citations omitted).

## 2. *Application*

Plaintiffs allege that Officer Clarke used excessive force when he arrested Lennox in Cobbler Square Park.[3] *See* Dkt. No. 1 at ¶ 37. Defendants respond that Officer Clarke's force was reasonable under the circumstances, because (1) "Officer Clarke encountered a disorderly Plaintiff in a public location" who had "already struck a minor child and while she was - to use her own words - having a mental 'breakdown,'" (2) the scene at the park "was chaotic and involved multiple angry screaming individuals - including Plaintiff - and minor children," and (3) Lennox attempted to flee from Officer Clarke's custody. *See* Dkt. No. 27-15 at 21-22. Thus, Defendants argue, it was "objectionably reasonable for Officer Clarke to presume that . . . in fleeing, Plaintiff could be a danger to herself or others," and so, he "made a split-second decision to bring Plaintiff to the ground in order to regain control over her and to prevent her from fleeing custody." *See id.* at 22 (citing *Graham*, 490 U.S. at 396-97).

---

[3] Although the Complaint does not specify, in Lennox's deposition she stated that the excessive force claim was brought against Officer Clarke only. *See* Dkt. No. 27-11 at 107-08.

While the situation in the park was undoubtedly chaotic, the Court cannot say as a matter of law that the amount of force used by Officer Clarke was objectively reasonable. The parties agree that Lennox was handcuffed while standing, and was not brought to the ground until after she "pull[ed] away" from Officer Clarke. *See* Dkt. No. 27-18 at 106 (Lennox claiming that although she tried to "pull away" from Officer Clarke while she was in handcuffs, he was too strong for her "to even attempt anything"); Dkt. No. 27-14 at ¶¶ 42, 43 (Defendants claiming that Officer Clarke brought Lennox to the ground after she attempted to flee from his custody). Still, even if Lennox was attempting to flee, Officer Clarke could only respond with an amount of force that was reasonably related to Lennox's resistance. *See Sullivan*, 225 F.3d at 165-66.

The record contains issues of fact as to whether the force used by Officer Clarke was reasonably related to the nature of Lennox's resistance. First, the parties have very different accounts of Lennox's attempt to flee. *Compare* Dkt. No. 27-5 at 69-71 (Officer Clarke testifying at Lennox's criminal trial that he brought her to the ground to secure custody over her after she "attempted to pull away" while he was escorting her with only one hand), *and id.* at 103 (Officer Clarke testifying that Lennox resisted arrest), *with id.* at 140 (Lennox testifying that "he's huge. When he grabbed me, there was no movement, I couldn't move my arms and I had bruises from that"), *and* Dkt. No. 27-18 at 106 (Lennox stating that although she tried, she "couldn't really pull away from him" because Officer Clarke "was just way too strong to even attempt anything"). Additionally, reasonable jurors could disagree over whether the force that Officer Clarke used to bring Lennox to the ground was proportional to the perceived threat. *See* Dkt. No. 32 at ¶ 44 (claiming that Officer Clarke "placed so much pressure on her back and body it caused her to urinate all over herself"); Dkt. No. 27-18 at 106 (Lennox stating that she is "like a hundred thirty pounds. He's two hundred something, six foot. He had no problem. He didn't need to throw me

11

to the ground").  Thus, the Court cannot decide, as a matter of law, that Officer Clarke used a reasonable amount of force when he brought Lennox to the ground.

Defendants argue that Lennox's injuries were "superficial and fully healed within six (6) days of her arrest," which further supports their assertion that Officer Clarke used only a minimal amount of force against her.  *See* Dkt. No. 38 at 7.  The extent of the injury suffered is only one factor to be considered whether determining whether the use of force was excessive, *see Ortiz*, 88 F. Supp. 2d at 160, and the fact that injuries heal does not necessarily preclude a finding of excessive force, *see Robison*, 821 F.2d at 924 (finding that "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe").  It is undisputed that Lennox suffered swollen, bloody ears after her earrings were jammed into her cartilage during the arrest.  *See* Dkt. No. 37 at ¶ 86; *see also* Dkt. No. 27-8, Booking Video at 7:06-10:32, 16:40-16:45.  Those injuries are more than *de minimis* and may support a finding of excessive force.

Moreover, although the bruises on Lennox's arms and a scrape on her shoulder might not, on their own, support an excessive force claim, *see Lemmo*, 2011 WL 843974, at *5, since they are accompanied by the evidence of Lennox's bloody ears and may have occurred during the use of excessive force, the injuries are sufficiently jury-worthy, *see Robison*, 821 F.2d at 924 (finding that a plaintiff may recover for non-severe injuries if the force used was unreasonable and excessive); *see also Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004) (rejecting the district court's conclusion that "minor scrapes, bumps or bruises potentially could occur . . . during any arrest, and an arresting officer can not be held unremittingly liable for every such incident," and holding that the issue was sufficiently jury-worthy).  As such, Defendants' motion for summary judgment on the excessive force claim is denied.

**D.      Failure to Intervene**

*1.  Legal Standard*

In order to prevail on a Section 1983 claim for damages against an individual, the plaintiff must show that the individual was personally involved in the alleged deprivation of the plaintiff's rights.  *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001).  "A police officer is personally involved in the use of excessive force if he 'directly participates in an assault, or was present during the assault with reasonable opportunity to intercede on plaintiff's behalf yet failed to do so.'"  *McRae v. City of Hudson*, No. 1:14-CV-236, 2015 WL 275867, *6 (N.D.N.Y. Jan. 21, 2015) (quoting *Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007)).  "Under the latter theory, plaintiff must prove the use of excessive force by an individual and show that the defendant who allegedly failed to intervene: '1) possessed actual knowledge of the use . . . of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.'"  *Id.* (quoting *Lewis v. Mollette*, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010)).

*2.  Application*

Plaintiffs argue that Officer Miller, who was present during Lennox's arrest, should have intervened to stop Officer Clarke's use of force.  *See* Dkt. No. 27-19 at 108-09.  Defendants respond that "Plaintiff could offer no evidence that Officer Miller observed her to be in any type of distress when she was being arrested" and Officer Miller testified "that he did not observe Plaintiff to be in distress at the hands of Officer Clarke."  *See* Dkt. No. 27-15 at 22-23.  Based on the record, the Court finds that it is possible that Officer Miller witnessed Officer Clarke bring Lennox to the ground.  *See* Dkt. No. 27-16 at 140 (Lennox testifying in the criminal trial that she

was "screaming for help" during the arrest); *id.* at 153 (testifying that Officer Miller "looked me right in the face while I was on the ground when Officer Clarke bashed my head"). Therefore, issues of fact exist as to whether Officer Miller had actual knowledge of Officer Clarke's use of force against Lennox and disregarded a reasonable opportunity to intervene on her behalf. *See McRae*, 2015 WL 275867, at *6. Thus, Defendants' motion for summary judgment as to Officer Miller's liability for failure to intervene is denied.

Plaintiffs also bring a failure to intervene claim against Chief Marsh, arguing that he should have intervened at the police station to "see if [she] was okay, assist in helping [her] get cleaned up" because "he has the most authority out of all the officers." *See* Dkt. No. 27-11 at 109-10. The undisputed facts show that Chief Marsh was not present at the park during Lennox's arrest. *See id.* (Lennox testifying that the first time she saw Chief Marsh that day was at the police station). An officer's failure to assist after an incident of alleged force does not support a failure to intervene claim, because no reasonable juror could find that someone who was not present during the alleged exertion of force had actual knowledge and a reasonable opportunity to intervene. *See McRae*, 2015 WL 275867, at *6. As such, Defendants' motion for summary judgment as to Chief Marsh's liability for failure to intervene is granted.

## E. Qualified Immunity

### 1. Legal Standard

"The doctrine of qualified immunity shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was

violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and citations omitted). Objective reasonableness means that "[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (internal quotation marks and citations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is an issue of law to be decided by the court. *See id.* at 367-68 (citation omitted). However, any unresolved factual issues must be resolved by the jury. *See id.* at 368 (citing *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted).

### 2. *Application*

Defendants argue that qualified immunity shields Officer Clarke, Officer Miller, and Chief Marsh from the constitutional claims because Officer Clarke used a reasonable amount of force in response to Lennox's attempt to flee. *See* Dkt. No. 27-15 at 29-32. While the Court agrees with Defendants that the qualified immunity doctrine gives officers "an extra layer of protection 'from

the sometimes-hazy border between excessive and acceptable force,'" *see id.* at 30 (quoting *De Michele v. City of New York*, 2012 U.S. Dist. LEXIS 136460, *17 (S.D.N.Y. 2012)), that extra protection only shields the Officers if "it was objectively reasonable for them to believe their acts did not violate" Lennox's rights, *see Zellner*, 494 F.3d at 367. Because several issues of fact exist concerning whether the amount of force used by Officer Clarke during the arrest was reasonable, and whether Officer Miller had an opportunity to intervene, qualified immunity does not protect Defendants from those claims.

The cases on which Defendants rely that apply qualified immunity are distinguishable. First, although Defendants claim that the Second Circuit applied qualified immunity in *Brown* where officers forced the arrestee to the ground by kicking her legs, pushing her face into the pavement, and pepper spraying her twice in the face, *see* Dkt. No. 27-15 at 31, the Second Circuit actually applied qualified immunity on the false arrest claim, but held that the excessive force claim must go to the jury, *see Brown*, 798 F.3d at 100, 102-03. Second, several of the cases relied on by Defendants involve arrestees who fled prior to being handcuffed and were actively resisting arrest. *See Tracy*, 623 F.3d at 97-98 (finding it reasonable for an officer to tackle someone who "had managed to struggle free and was attempting to escape"); *Neal v. Wilson*, No. 15-CV-2822, 2017 U.S. Dist. LEXIS 151045, *21-23 (S.D.N.Y. 2017) (finding a "body hold" reasonable where the plaintiff pushed away the police officer's hands); *Bradley v. Village of Greenwood Lake*, 376 F. Supp. 2d 528, 535 (S.D.N.Y. 2005) (granting qualified immunity where an officer kicked the plaintiff in the stomach during the arrest after he ran and hid from officers). Unlike in those cases, Lennox was already handcuffed and in Officer Clarke's custody when she pulled away. *See* Dkt. No. 27-18 at 104-06. Lennox was far outmatched by Officer Clarke in size and strength, and there is no evidence that Lennox injured Defendant Clarke or came close to successfully

taking flight. *See id.* at 106 (Lennox stating that she is "like a hundred thirty pounds. He's two hundred something, six foot. He had no problem. He didn't need to throw me to the ground" and that Officer Clarke was "just way too strong to even attempt anything"). Accordingly, since the record contains issues of fact as to whether Defendant Clarke used a reasonable amount of force, qualified immunity does not protect the officers from facing a lawsuit on the constitutional claims.

**F.     City of Norwich**

*1. Legal Standard*

A municipality "may not be held liable under Section 1983 *unless* the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson*, No. 04-CV-6338, 2004 WL 2123490, *2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. N.Y.C. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). This is because "[m]unicipalities are not subject to Section 1983 liability solely on the basis of a *respondeat superior* theory." *Id.*

To demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom . . . that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection - an "affirmative link" - between the policy and the deprivation of his constitutional rights.'" *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). To establish a municipal policy or custom, the plaintiff must show "either (1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or

usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 430 (S.D.N.Y. 2012) (citing *Jouthe v. City of New York*, No. 05-CV-1374, 2009 WL 701110, *7 (E.D.N.Y. Mar. 10, 2009)).

### 2. Application

Defendants argue that Plaintiffs have not established either "(1) the existence of a City policy or identifiable custom under which [her] alleged injuries occurred; or (2) a causal connection between such policy and a constitutional deprivation." *See* Dkt. No. 27-15 at 26. Plaintiffs respond that Chief Marsh's failure to provide Lennox assistance or medical care while she was in the booking area, combined with the NPD's failure to properly address Lennox's personnel complaint, shows that Norwich had a policy or custom of allowing the police to violate individuals' constitutional rights. *See* Dkt. No. 33 at 14-15.

The Court agrees with Defendants that although the Complaint alleges that the NPD directly encourages police misconduct by failing to adequately discipline officers for misconduct, "Plaintiff[s] ha[ve] offered absolutely no evidence" to support this allegation. *See* Dkt. No. 27-15 at 25-26. First, NPD has a written Use of Physical Force policy that specifically states that "[o]fficers shall employ the minimum degree of force that is necessary to achieve their lawful objectives," and provides steps for officers to take after they have used physical force in the performance of their duties. *See* Dkt. No. 27-7 at 2-4. Additionally, there is no evidence to suggest that NPD engaged in a permanent or widespread practice of not helping arrestees after force has been used on them, or of not properly responding to personnel complaints. *Bektic-Marrero*, 850 F. Supp. 2d at 430. In fact, despite Plaintiffs' claim that Lennox did not receive any assistance while she was in the holding area, the evidence shows that officers

communicated with Lennox, attempted to calm her down, assisted with her handcuffs, and

brought her to the hospital after she was processed.  *See, e.g.*, Dkt. No. 27-8, Booking Video at

3:40-4:34, 5:00-5:27; Dkt. No. 37 at ¶ 48.  Accordingly, no reasonable juror could find *Monell*

liability here, and judgment is issued in favor of the City of Norwich.

## G.    Pendent State Law Claims[4]

### 1. Negligence

#### a. Legal Standard

Under New York law, to prevail on a negligence claim a plaintiff must establish (1) that

the defendant owed the plaintiff a duty of care, (2) that the defendant breached that duty, and (3)

as a result of the breach, the plaintiff suffered damages.  *See Pasternack v. Lab. Corp. of Am.*, 892

F. Supp. 2d 540, 546-47 (S.D.N.Y. 2012) (citation omitted).  "'[H]arm predicated on an

intentional act may not give rise to a claim of negligence.'"  *Frederique v. Cty. of Nassau*, 168 F.

Supp. 3d 455, 484 (E.D.N.Y. 2016) (quoting *Bah v. City of New York*, No. 13-CV-6690, 2014

WL 1760063, *13 (S.D.N.Y. May 1, 2014)); *see also Dineen v. Stramka*, 228 F. Supp. 2d 447,

454 (S.D.N.Y. 2002) ("When a plaintiff asserts excessive force and assault claims which are

premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the

same conduct will not lie").

In order to prove negligence against a municipality acting in its governmental capacity,

such as "for the protection and safety of the public pursuant to the general police powers," the

---

[4] Defendants ask the Court to decline to exercise supplemental jurisdiction over the state law negligence and assault and battery claims. *See* Dkt. No. 27-15 at 28 n.13. However, the Court finds that some of Plaintiffs' federal claims survive summary judgment, and the state law claims are so related to these federal claims that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a). Therefore, the Court will exercise supplemental jurisdiction over Plaintiffs' state law claims.

plaintiff must show that she was owed a "special duty." *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425-26 (2013) (internal quotation marks and citation omitted). The "special duty" arises when (1) the municipality assumes an affirmative duty to act on behalf of the party who was injured, (2) the municipality's agents knew that inaction could lead to harm, (3) there was some form of direct contact between the municipality's agents and the injured party, and (4) the party justifiably relied on the municipality's affirmative undertaking. *Id.* at 431.

The limitation on liability applies equally to municipal agents. *See In re World Trade Cntr. Bombing Litig.*, 17 N.Y.3d 428, 452 (2011) (holding "when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice" (internal citation omitted)). The purpose of that policy is "to ensure that public servants are free to exercise their decision-making authority without interference from the courts," and it "'reflects a value judgment that - despite injury to a member of the public - the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions . . . outweighs the benefits to be had from imposing liability for that injury.'" *Valdez v. City of New York*, 18 N.Y.3d 69, 76 (2011) (quoting *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991)).

### b. Application

The Complaint alleges that Defendants owed Lennox a duty to utilize reasonable care when they physically interacted with her, that Defendants breached that duty by negligently striking, touching, and handling Lennox in a rough manner, and that Lennox suffered physical injuries and emotional distress as a result.[5] *See* Dkt. No. 1 at ¶¶ 40-46. Defendants moved for

---

[5] The Complaint also alleges that Defendants' negligence caused A.L. to suffered from emotional distress, mental anxiety, and post-traumatic stress disorder, *see* Dkt. No. 1 at ¶ 44,

(continued...)

summary judgment on this issue, arguing that as government agents, they are immune from tort liability for negligence. *See* Dkt. No. 27-15 at 28. Plaintiffs did not respond to this argument in their Opposition. As such, the Court finds that Plaintiffs have abandoned the negligence claim. *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (noting that a counseled response to a motion for summary judgment that makes some - but not all - arguments available generally "reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others"); *see also Howard v. City of New York*, 62 F. Supp. 3d 312, 324 (S.D.N.Y. 2014) (applying *Jackson*).

Even so, the negligence claim fails as a matter of law. First, accepting Plaintiffs' allegations as true, there is nothing in the record to suggest that Officer Clarke's contact with Lennox was "inadvertent, accidental, or anything but willful." *See Frederique*, 168 F. Supp. 3d at 484 (internal quotation omitted) (finding that an intentional act cannot support a negligence claim). Thus, no reasonable juror could find that Officer Clarke was negligent during Lennox's arrest. *See Dewitt v. Home Depot U.S.A., Inc.*, No. 10-CV-3319, 2012 WL 4049805, *11 (E.D.N.Y. Sept. 12, 2012) (granting summary judgment where the defendant's "offensive bodily contact with the plaintiff - if it occurred at all - was intentional and not negligent"). As for Officer Miller and Chief Marsh, each was acting pursuant to the municipalities' general police powers, and the record does not contain any facts to suggest that they owed Lennox a special duty. *See Applewhite*, 21 N.Y.3d at 431. Therefore, the negligence claim fails as a matter of law.

### 2. *Assault and Battery*

#### a. *Legal Standard*

---

[5](...continued)
which the Court addressed earlier in this Memorandum-Decision and Order, *see supra* § III(B).

Under New York law, assault is "the intentional placing of another in apprehension of imminent harmful or offensive contact," and battery is "(1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent." *Merzon v. Cty. of Suffolk*, 767 F. Supp. 432, 448 (E.D.N.Y. 1991). "To succeed on an assault or battery claim in the law enforcement context, a plaintiff must demonstrate that defendants' conduct 'was not reasonable within the meaning of the New York statute concerning justification for law enforcement's use of force in the course of performing their duties.'" *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, *13 (S.D.N.Y. Apr. 11, 2014) (quoting *Torres-Cuesta v. Berberich*, 511 Fed. Appx. 89, 91 (2d Cir. 2013)). Essentially, the Fourth Amendment excessive force standard applies to assault and battery claims against a police officer under New York law. *Humphrey v. Landers*, 344 Fed. Appx. 686, 688 (2d Cir. 2009) ("Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical") (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)); *see also Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, *6-7 (E.D.N.Y. Dec. 22, 2008) (finding that assault and battery claims would survive summary judgment where the excessive force claim withstood summary judgment).

### b. *Application*

Plaintiffs bring state law assault and battery claims against Officer Clarke.[6]  Defendants argue that the assault and battery claims fail as a matter of law for the same reasons that the excessive force claim fails.  *See* Dkt. No. 27-15 at 29.  As discussed above, there are issues of fact regarding whether the amount of force that Officer Clarke used was objectively reasonable.

---

[6] Although the Complaint does not specify, at her deposition, Lennox testified that she was bringing the assault and battery claims against Officer Clarke only.  *See* Dkt. No. 27-11 at 115-17; *see also* Dkt. No. 33 at 12 (alleging that Lennox "was assaulted by Defendant Clarke").

Therefore, since the essential elements of assault and battery claims are substantially identical to Section 1983 excessive force claim, *see Humphrey*, 344 Fed. Appx. at 688, the assault and battery claims against Officer Clarke must go to the jury.

**H.   Punitive Damages**

*1. Legal Standard*

Municipalities are immune from punitive damages under Section 1983 for the bad faith actions of their officials.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  However, a plaintiff may recover punitive damages against a government official in his individual capacity, if the plaintiff shows that "the official acted with a malicious or evil intent or in callous disregard of the Plaintiff's federally protected rights." *Helijas v. Corr. Med. Care, Inc.*, No. 1:15-CV-1049, 2016 WL 5374124, *17 (N.D.N.Y. Sept. 26, 2016) (quoting *Pritchard v. Town of New Hartford*, No. 14-CV-1477, 2016 WL 4523986, *4 n.2 (N.D.N.Y. Aug. 22, 2016)).  "Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.'" *Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, *15 (E.D.N.Y. Sept. 20, 2005) (quoting *Smith v. Wade*, 461 U.S. 30, 52 (1983)).

*2. Application*

Defendants argue that Plaintiffs' claims for punitive damages must be dismissed because punitive damages are not recoverable against municipalities.  *See* Dkt. No. 27-15 at 33-34.  The Court agrees that Plaintiffs cannot maintain a claim for punitive damages against the City of Norwich.  *See City of Newport*, 453 U.S. at 271.  Still, Lennox may be entitled to an award of punitive damages against Officers Clarke or Miller, if they acted with a malicious or evil intent or in callous disregard of her federally protected rights.  *See Helijas*, 2016 WL 5374124, at *17.

23

Since that question is best left for the jury, Defendants' motion for summary judgment on this issue is denied as to Officers Clarke and Miller.

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby,

**ORDERS** that the claims brought on behalf of Plaintiff **A.L.** are **DISMISSED** in their entirety; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment is **GRANTED** as to all claims against Defendants **RODNEY V. MARSH** and the **CITY OF NORWICH, NEW YORK**; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment is **GRANTED** as to the negligence claim against Defendants **BRANDON CLARKE** and **THOMAS MILLER**; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment is **DENIED** as to the excessive force and assault and battery claims against Defendant **BRANDON CLARKE** and the failure to intervene claim against Defendant **THOMAS MILLER**; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiffs' request for punitive damages against Defendants **BRANDON CLARKE** and **THOMAS MILLER**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 17, 2019
          Albany, New York

Mae A. D'Agostino
U.S. District Judge